Robert L. SIMON, Petitioner,

v.

SIMMONS FOODS, INC., formerly known as Simmons Industries, Inc., Intervenor,

The Secretary of the United States Department of Labor, Respondent.

No. 94–2421.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1994.

Decided Feb. 27, 1995.

Thomas Devine, Washington, DC, argued (Thomas Devine and Richard Condit appear on the brief), for petitioner.

Paul L. Friedman, Washington, DC, argued (Thomas S. Williamsson, Jr., Monica Gallagher, William J. Stone and Paul L. Frieden, appear on the brief), for respondents.

Before RICHARD S. ARNOLD, Chief Judge; HEANEY, Senior Circuit Judge; and FAGG, Circuit Judge.

HEANEY, Senior Circuit Judge.

Robert L. Simon, a security guard at Simmons Foods, Inc. ("Simmons Foods") was suspended without pay on January 8, 1987, and discharged eleven days later for making "false and malicious statements to a member of the general public" concerning the company's operations. A number of events preceded Simon's discharge, all of which need not be recited here. Suffice it to say that at the time of Simon's discharge, Simmons Foods, which operates a chicken producing and processing plant in Southwest City, Missouri, was being investigated by a U.S. government task force for allegedly feeding heptachlor-contaminated feed to its chickens, and Simon was cooperating with the government in its investigation. Simon was discharged for telling Bob Applegarth, a contractor who collected scrap metal at the Southwest City plant, that the company fed heptachlor-contaminated chicken feed to its chickens, sold the contaminated chickens, and burned and buried a substantial quantity of the tainted feed on its property.

Upon being discharged Simon promptly filed an employee discrimination complaint with the Wage and Hour ("W & H") Division of the United States Department of Labor, claiming that his suspension and discharge were in violation of the whistleblower protection provisions of the Toxic Substances Control Act, 15 U.S.C. § 2622 (1988); the Water Pollution Control Act, 33 U.S.C. § 1367 (1988); the Solid Waste Disposal Act, 42 U.S.C. § 6971 (1988); and the Clean Air Act, 42 U.S.C. § 7622 (1988). The administrator of the W & H Division found that Simon was discharged because of his cooperation with government officials in the heptachlor probe. Accordingly, he held that Simon's cooperation with the government's investigation was protected activity under the relied upon statutes and that Simon was entitled to reinstatement and back pay.

Simmons Foods appealed the W & H administrator's decision, and an administrative law judge (ALJ) found in favor of the company. The ALJ held that, notwithstanding evidence of a partially retaliatory motive on the company's part, Simon would have been discharged even if he had not engaged in protected activity because of the false and potentially damaging statements he made to Applegarth about the company.

Simon appealed the ALJ's decision to the Secretary of Labor, who framed the issue in somewhat different terms. The Secretary focused on whether the statements Simon made to Applegarth were within the realm of activity Congress sought to protect in enacting the whistleblower statutes relied upon here. The statements were not protected activity, he held, because making health and safety complaints to a member of the general public, without demonstrating that the employee "is about to file a complaint or participate or assist in a proceeding," see infra, is too remote from the remedial purposes of the relied upon whistleblower provisions to be a protected activity.[1] Simon v. Simmons Indus., Inc., No. 87–TSC–2, April 4, 1994, slip op. at 6. The Secretary further found that no inference could be drawn that the company had knowledge of Simon's cooperation with the government, and that even assuming that Simmons Foods had knowledge of Simon's cooperation, the company would have terminated Simon for the statements he made to Applegarth about the contaminated feed. Id. at 8. We find that substantial evidence supports the findings of the ALJ and the Secretary that Simmons Foods had a legitimate, nondiscriminatory reason for discharging Simon because of the false and potentially damaging statements he made about the company and, accordingly, we affirm.

## I.

The two statutes over which this court has jurisdiction on appeal—the Water

---

1. The Secretary distinguished this case from those in which an employee makes health and safety complaints to a co-worker, employer/supervisor, union officer, or newspaper reporter. See Passaic Valley Sewerage Comm'rs v. Department of Labor, 992 F.2d 474 (3rd Cir.), cert. denied, —— U.S. ——, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993); Phillips v. Interior Bd. of Mine Oper-

ations Appeals, 500 F.2d 772 (D.C.Cir.1974), cert. denied, 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975); Donovan v. Diplomat Envelope Corp., 587 F.Supp. 1417 (E.D.N.Y.1984), aff'd without op. 760 F.2d 253 (2d Cir.1985); Donovan v. R.D. Andersen Const. Co., 552 F.Supp. 249 (D.Kan. 1982).

Pollution Control Act and the Solid Waste Disposal Act [2]—contain virtually identical language. Both read as follows (the bracketed portions indicate where the latter differs from the former):

> No person shall fire, or in any way discriminate against, or cause to be fired or discriminated against, any employee or any authorized representative of employees by reason of fact that such employee or representative has filed, instituted, or caused to be filed or instituted any proceeding under this chapter [or under any applicable implementation plan], or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter [or of any applicable implementation plan].

33 U.S.C. § 1367(a); 42 U.S.C. § 6971(a). Generally, to establish a prima facie case of retaliatory discharge, a plaintiff must show that (1) he or she engaged in protected activity; (2) the employer had actual or constructive knowledge of the protected conduct; (3) the alleged discrimination occurred; and (4) a nexus exists making it likely that the protected activity led to the alleged discrimination. *See Couty v. Dole,* 886 F.2d 147, 148 (8th Cir.1989) (retaliatory discharge claim under Energy Reorganization Act of 1974, 42 U.S.C. § 5851(a)(1)); *Keys v. Lutheran Family & Children's Serv. of Missouri,* 668 F.2d 356, 358 (8th Cir.1981) (retaliatory discharge claim under section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a)); *Womack v. Munson,* 619 F.2d 1292, 1296 n. 6 (8th Cir.1980) (same), *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). Where there is evidence of "dual motive", *e.g.,* where reasons other than retaliation may also account for the employee's discharge, the employer has the burden of proving by a preponderance of the evidence that it would have terminated the employee even if the employee had not engaged in the protected conduct. *See Passaic Valley Sewerage Comm'rs v. Department of Labor,* 992 F.2d 474, 481 (3rd Cir.) (retaliatory discharge under § 507(a) of the Clean Water Act) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)), *cert. denied,* — U.S. —, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993); *N.L.R.B. v. Vincent Brass & Aluminum Co.,* 731 F.2d 564, 566–67 (8th Cir.1984) (retaliatory discharge under §§ 8(a)(1), (3), and (5) of the National Labor Relations Act) (adopting analysis set forth in *Wright Line, A Div. of Wright Line, Inc.,* 251 NLRB 1083, 1089, 1980 WL 12312 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)); *N.L.R.B. v. Fixtures Mfg. Corp.,* 669 F.2d 547, 550 (8th Cir.1982) (retaliatory discharge under §§ 8(a)(1) and (3) of the National Labor Relations Act).

Our review of the Secretary's order is controlled by the Administrative Procedure Act under which an agency decision will be set aside if it is unsupported by substantial evidence or is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. §§ 706(2)(A)–(E); *see Erickson Transp. Corp. v. I.C.C.,* 728 F.2d 1057, 1062 (8th Cir.1984). In reviewing an agency's decision, we consider the entire record before us, including the ALJ's recommendation and any evidence that is contrary to the agency's determination. *Blackburn v. Martin,* 982 F.2d 125, 128 (4th Cir.1992) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951)). While much deference is usually accorded to an agency's expertise and discretion when the agency adopts the findings of the ALJ, *see First Nat'l Bank of Eden v. Department of Treasury,* 568 F.2d 610, 611 (8th Cir.1978), a slightly different rule applies when the administrative agency rejects the ALJ's findings. *Citizens State Bank of Marshfield,*

---

2. This court has jurisdiction over two of the four Acts on which Simon relies—the Water Pollution Control Act, 33 U.S.C. § 1367(b), and the Solid Waste Disposal Act, 42 U.S.C. § 6971(b). Both the Clean Air Act, 42 U.S.C. § 7622(c)(1), and the Toxic Substances Control Act, 15 U.S.C. § 2622(c)(1), require that a petition for review be filed with the appropriate court of appeals within sixty days of the Secretary's final order. In the instant case, Simon filed his petition for review with this court on June 7, 1994, more than sixty days from the Secretary's April 4, 1994, final order. This filing requirement is jurisdictional; thus the time for filing a petition for review may not be enlarged. *See* Fed.R.App.P. 26(b).

*Mo. v. F.D.I.C.*, 718 F.2d 1440, 1444 (8th Cir.1983). An agency departing from the findings of the ALJ must show that it gave attentive consideration to the ALJ's conclusions. *Citizens State Bank of Marshfield, Mo. v. F.D.I.C.*, 751 F.2d 209, 214 (8th Cir. 1984). Such consideration may be found if the agency decision reflects an awareness of the ALJ's findings and gives reasons for reaching a different conclusion with respect to those findings. *Id.*

The ALJ found that a reasonable inference could be drawn that Simmons Foods was aware of Simon's cooperation with the government based on a meeting Simon had with two company officers the morning of January 8, 1987. Simon met with the officers to discuss a written statement Applegarth gave detailing his conversation with Simon about the contaminated feed. During the meeting, Simon admitted talking to Applegarth, but denied significant portions of Applegarth's account of their conversation. When one of the officers, Carl Hall, read aloud the portion in Applegarth's statement about Simon's statements regarding the contaminated feed, Simon refused to comment. Hall asked Simon who advised him not to comment, and Simon responded by producing the business card of John Eikel, one of the government agents with whom he had met. Appellant's Br. at 19. While ultimately agreeing with the ALJ that the company had a legitimate reason for discharging Simon because of the statements he made to Applegarth, the Secretary found that Simon's response to Hall's question was too "ambiguous" and "enigmatic" to put the company on notice of Simon's cooperation with the government. *Simon v. Simmons Indus., Inc.*, No. 87–TSC–2, April 4, 1994, slip op. at 6–7.

■ We believe that Simon's response was sufficiently unambiguous to put a reasonable person on notice that Simon was cooperating with the government. "The presence or absence of retaliatory motive is a legal conclusion and is provable by circumstantial evidence even if there is testimony to the contrary by witnesses who perceived lack of

such improper motive." *Ellis Fischel State Cancer Hosp. v. Marshall*, 629 F.2d 563, 566 (8th Cir.1980), *cert. denied,* 450 U.S. 1040, 101 S.Ct. 1757, 68 L.Ed.2d 237 (1981). The company was aware that operations at its plant were being investigated. This information, coupled with Simon producing Eikel's business card and declining further comment at his meeting with company officers, supports the reasonable inference that Simon was cooperating with the government in its investigation. Of significance is the timing of Simon's suspension and discharge. Simon was suspended just hours after meeting with company officers to discuss Applegarth's statement and was discharged eleven days later. This arguably suspicious sequence of events suggests the presence of at least a partially retaliatory motive. *See* ALJ's July 14, 1988, Recommended Decision and Order Dismissing Complaint, at 5.

Having found that a reasonable inference can be made that Simmons Foods discharged Simon based in part on his cooperation with the government, we must decide whether substantial evidence supports the Secretary's finding that Simmons Foods would have discharged Simon for the false and potentially damaging statements he made to Applegarth about the company's use of heptachlor-contaminated feed even if Simon had not engaged in protected conduct. The ALJ specifically found, and the Secretary accepted his findings, that Applegarth was a "sincere and credible" witness who withstood pointed cross-examination and testified truthfully that Simon told him there were thousands of tons of heptachlor-tainted feed buried on Simmons Foods' property; that it was noticeable when the company started feeding the heptachlor-contaminated feed to its chickens because the birds became white and flabby; and that the company shipped the contaminated chickens from its premises. Tr. at 365–66. The ALJ further found that Simmons Foods made a reasonable credibility assessment when it believed Applegarth's, and not Simon's, account of the statements Simon made to Applegarth.[3] We see no

3. Simon's recollection of his conversation with Applegarth differed from Applegarth's. According to Simon's version of the conversation, Si-

mon commented that Simmons Foods "had a lot of things buried" on its property such as feed, lumber, and electric motors. Vol. I. App. at 73–

reason to question the ALJ's finding that Applegarth was the more credible of the two witnesses.

■ Because the record substantially supports the findings of the Secretary and the ALJ that Simmons Foods would have discharged Simon for the false and potentially damaging statements he made about the company even if he had not engaged in protected activity, we affirm.

74. When the two noticed chickens roaming nearby, Simon commented that the chickens "were kind of white around the beaks and around the legs" and that "they did not look like normal chickens." *Id.* at 74. Applegarth agreed, and Simon suggested that the reason the chickens were white was because of their breeding. *Id.*