UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 03-1749

DIANA R. WILLIAMS,

Petitioner,

versus

UNITED STATES DEPARTMENT OF LABOR; BALTIMORE
CITY PUBLIC SCHOOLS SYSTEM,

Respondents.

On Petition for Review of an Order of the Administrative Review
Board.  (01-021)

Argued:  February 1, 2005          Decided:  November 18, 2005

Before WIDENER, MOTZ, and GREGORY, Circuit Judges.

Affirmed by unpublished per curiam opinion.  Judge Gregory wrote a
dissenting opinion.

**ARGUED:** Kelly W. McDonald, Third Year Law Student, UNIVERSITY OF
VIRGINIA SCHOOL OF LAW, Appellate Litigation Clinic,
Charlottesville, Virginia, for Petitioner.  Linda Carol Arnold,
UNITED STATES DEPARTMENT OF LABOR, Office of the Solicitor,
Washington, D.C., for Respondent.  **ON BRIEF:** Neal L. Walters,
Berton W. Ashman, Jr., Third Year Law Student, UNIVERSITY OF
VIRGINIA SCHOOL OF LAW, Appellate Litigation Clinic,
Charlottesville, Virginia, for Petitioner.  Howard M. Radzely,
Solicitor of Labor, Steven J. Mandel, Associate Solicitor, Fair
Labor Standards, Ford F. Newman, Counsel for Contract Labor

Standards, UNITED STATES DEPARTMENT OF JUSTICE, Office of the Solicitor, Washington, D.C., for Respondent.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Diana R. Williams appeals the United States Department of Labor Administrative Review Board's Final Decision and Order accepting the Administrative Law Judge's Recommended Decision and Order to deny her wrongful termination complaint against the Baltimore City Public School System. Mrs. Williams alleges that she was unlawfully terminated due to her involvement in a course of protected activities relating to her complaints and attempts to expose lead and asbestos hazards at several Baltimore City schools. We are of opinion that the review board's decision dismissing Mrs. Williams' complaint was supported by substantial evidence, and accordingly, we affirm.

I.

The factual details of this case are extensive, but the relevant facts can be summarized as follows. Mrs. Williams taught mathematics at schools within the Baltimore City Public School System (System). Mrs. Williams spent most of her career at Fairmount-Harford High School (Fairmount), although in 1997 the school system transferred her to Southeast Middle School (Southeast) because Mrs. Williams believed Fairmount's building was unsafe after renovation, apparently because of inadequate lead and asbestos removal.

3

From 1996 to 1998, Mrs. Williams was convinced the System schools contained unsafe levels of lead and asbestos. Mrs. Williams took several steps to effect school safety and community awareness. She became a lead abatement expert so her own testing of school conditions would carry more weight. She filed several complaints with the Maryland Occupational Safety and Health Administration (MOSH), wrote letters to the Mayor of Baltimore, notified television and news organizations, contacted school principals and the Baltimore City Council, distributed fliers at schools and in nearby neighborhoods, videotaped school conditions, and interviewed a pregnant high school student alleging the student's pregnancy complications resulted from school conditions. She also refused to work for much of the 1996-1997 school year because of her concerns about the conditions at Fairmount. It is not contested that Mrs. Williams' initial actions were protected activity and triggered MOSH investigations. The administrative law judge and the review board held, however, that after the schools were deemed safe, Mrs. Williams' continued activities, especially her distribution of two letters and a flier, which impeded the schools' educational function, was unreasonable and unprotected.

First, shortly before the school year began on September 3, 1997, Mrs. Williams wrote a letter to the Mayor of Baltimore. Mrs. Williams' letter claimed Fairmount's staff and students had been exposed to lead and requested analysis of every painted surface of

4

the school buildings and a soil analysis of the school's play area. Mrs. Williams offered to do the testing and requested the school be shut down while the testing was conducted. Mrs. Williams attempted to distribute copies of the letter at Fairmount but was asked to leave by the principal. Mrs. Williams then went to Southeast, where she placed copies on the cars in Southeast's parking lot. Mrs. Williams also distributed the letter to cars in a church parking lot, and she mailed a copy to the Baltimore Times, which published the letter. According to the administrative law judge, however, by December 1996, it was unreasonable for Mrs. Williams to allege Fairmount's conditions were unsafe. By 1996, "testing and cleanup had occurred, a lead abatement contractor and asbestos contractor were engaged on an ongoing basis, and the staff and students had been screened for elevated lead levels. MOSH had investigated the Claimant's complaints, and found that the building was safe for occupancy."

Second, in April 1998, Mrs. Williams prepared a flier she distributed alleging James Mosher Elementary School (James Mosher), Highlandtown Middle School (Highlandtown), and Fairmount had been cited for lead-based paint hazards by an expert on lead abatement.[1] Mrs. Williams' flier told parents their children needed to be tested for lead and asbestos exposures; additionally, Mrs. Williams identified herself as a lead expert and provided her name and phone

---

[1]The expert referred to was Mrs. Williams.

number on the flier. Mrs. Williams distributed this flier to students and staff at James Mosher and at nearby apartment complexes. James Mosher's principal, Mrs. Cascelia Spears, testified that her office heard from numerous parents about Mrs. Williams' flier. Mrs. Williams also complained of lead problems at Highlandtown, but MOSH inspectors had inspected these schools and found no grounds for citation.

Third, by a letter dated February 24, 1999, Mrs. Williams addressed the parents of children at Southeast regarding lead in the drinking water at the school. Mrs. Williams obtained without the school's permission a list of students' parents' names and addresses and sent a letter to each address. Mrs. Williams' letter warned parents that the school's drinking water contained unacceptably high amounts of lead. Mrs. Williams also included one of her personal business cards identifying herself as a lead abatement expert. At the time Mrs. Williams sent this letter, the school had turned off all the water fountains and established stations to distribute bottled water pursuant to the City Heath Department's recommendation. School officials stated that due to Mrs. Williams' letter, Southeast received so many phone calls from concerned parents and the media that the area office was unable to reach them by phone and had to use the telefax for emergencies.

On May 7, 1999, Dr. Robert Booker, the Chief Executive Officer of the System (CEO), recommended to the Baltimore City Board of

6

School Commissioners (School Board) that Mrs. Williams be dismissed for misconduct. Mrs. Williams was placed on emergency suspension without pay, pending further disciplinary action. According to the evidence before the administrative law judge, a teacher needs permission from her principal to have access to the school system's list of names and addresses, which is privileged information. On August 26, 1999, Mrs. Williams received a dismissal hearing before a hearing examiner of the Baltimore School Board.[2] The hearing examiner found merit in Mrs. Williams' allegations and recommended against her dismissal. The School Board rejected the recommendation of the hearing examiner and affirmed the CEO's decision to dismiss Mrs. Williams for misconduct in office. The federal administrative law judge concluded:

> [T]he Board found that the Claimant committed misconduct in office by failing to follow the chain of command when she disseminated information about alleged potential health hazards at three System schools. Additionally, the Board also found that she did not have permission to obtain the home addresses of the approximately 500

---

[2]There were two levels of administrative review. The Baltimore School Board caused Mrs. Williams' complaints and the incidents of her discharge to be heard before a hearing examiner, who reviewed the decision of the Chief Executive Officer of the School System to discharge her. That hearing examiner reported favorably for Mrs. Williams, but the School Board did not accept his decision. Mrs. Williams then filed suit under the various statutes such as the Safe Drinking Water Act, 42 U.S.C. § 300j-9(i)(2) to have her discharge reviewed by the Secretary of Labor. An administrative law judge first heard the case and decided against Mrs. Williams, which decision she appealed to the Administrative Review Board. That board affirmed the decision of the administrative law judge. The decision of the review board became the decision of the Secretary of Labor.

students at Southeast, and that this confidential student information was wrongfully acquired to further the Claimant's personal goals and objectives. The Board concluded that the Claimant violated the Ethics Laws and Codes of Conduct of Baltimore City in attaching her personal business card to this communication. The Board disagreed with the hearing examiner's conclusions, and found that the Claimant's repeated failure to follow proper procedure when addressing alleged health and safety concerns had a direct bearing on her fitness to teach, such that it would undermine her future classroom performance and overall impact on students.

The administrative law judge also reviewed evidence which tended to show that Mrs. Williams' perceptions may have been derived from psychological problems. The administrative law judge noted Mrs. Williams, "acknowledged that her doctor has diagnosed her with depression and stress, and suggested medication. She is angry at the 'system,' and suspicious that MOSH has been concealing the facts; she will not take medication, but prefers to rely on her faith." The administrative law judge also reviewed a report from Dr. Stephen W. Siebert, who conducted a psychiatric evaluation of Mrs. Williams. Siebert concluded some of Mrs. Williams' allegations "seemed highly implausible" and "might not be reality based." Siebert noted Mrs. Williams had a "paranoid stance" and believed there was a "coverup involving many people." Siebert felt Mrs. Williams "rationalized facts to her own beliefs." Siebert also noted Mrs. Williams dismissed school reports and studies as biased or fraudulent. Siebert did not find that Mrs. Williams suffered from acute stress, posttraumatic stress disorder, or major depression. Siebert instead believed Mrs. Williams "had either a

8

delusional or personality disorder representing a preexisting condition, not causally related to any accidental injury."

In 1999, Mrs. Williams filed a complaint with the Department of Labor. She alleged she had been wrongfully terminated in retaliation for whistleblowing about environmental hazards in System schools in violation of employee protections set forth in the Safe Drinking Water Act, 42 U.S.C. § 300j-9 (2000); the Toxic Substances Control Act, 15 U.S.C. § 2622; the Clean Air Act, 42 U.S.C. § 7622 (2000); the Solid Waste Disposal Act, 42 U.S.C. § 6971 (2000); the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9610 (2000); and the Federal Water Pollution Control Act, 33 U.S.C. § 1367 (2000).

On November 30, 2000, the administrative law judge issued a recommended decision and order, finding that Mrs. Williams failed to prove that the System was motivated in whole or in part by any protected activity by Mrs. Williams when it suspended and dismissed her from her position as a mathematics teacher. The administrative law judge found Mrs. Williams' initial complaints to "various regulatory groups, as well as her public airing of her concerns about the potential safety hazards presented by the renovation project occurring at Fairmount, were clearly protected activity within the meaning of the applicable statutes." However, the administrative law judge found Mrs. Williams' actions lost their protected status after her concerns were investigated and the

9

buildings were found safe. The administrative law judge also determined that Mrs. Williams refused to accept these results, and her continued perceptions of the environmental conditions of the System became unreasonable. Additionally, the administrative law judge determined that the allegations regarding school safety that Mrs. Williams made during the last three years of her System employment were motivated by her desire to "use the cloak of whistleblower" to avoid disciplinary action for her attendance problems. Finally, the administrative law judge found Mrs. Williams' unauthorized letters and fliers provided the System with a legitimate, nondiscriminatory basis for her dismissal.

The report of Administrative Law Judge Chapman is 44 pages in length. It is carefully and dispassionately done. We invite attention to that excellent report.[3]

The plaintiff appealed, and on May 30, 2003, the administrative review board affirmed and, with an inconsequential

---

[3]If footnote 7 of the opinion of the Administrative Review Board of the Department of Labor is meant to emphasize that a preponderance of the evidence is not required in proving a prima facie case in a charge of discrimination such as this, it is likely contrary to Burdine, 450 U.S. at 253. If footnote 7 is meant to emphasize that following a trial on the merits in such cases, the proof of a prima facie case is usually inconsequential as dealing with the "vagaries of the prima facie case," it is consistent with Jiminez v Mary Washington College, 57 F.3d 369, 377 (4th Cir. 1995). In any event, the treatment of the proof of a prima facie case is inconsequential here because neither the ALJ nor the Administrative Review Board based Mrs. Williams' loss on any failure to prove a prima facie case. The fact finding of the ALJ is supported by substantial evidence.

exception, affirmed both the fact finding and application of precedent of the administrative law judge in its final decision. The review board noted Mrs. Williams' briefs "barely" addressed the administrative law judge's conclusions of law and instead quarreled with the administrative law judge's factual findings by asserting all of her whistleblowing activities were supported by evidence and were valid since, she alleged, the lead and asbestos problems had not been adequately resolved. The review board concluded, "[The System]'s proferred reasons for suspending and dismissing Williams--her unauthorized use of the names and addresses of persons to whom she sent the letters and the disruption in the school system caused by circulating the unfounded allegations--were legitimate and nondiscriminatory. According to the ALJ, Williams did not establish that these reasons were a pretext for discrimination." Mrs. Williams appeals the review board's final decision and order.

## II.

This court reviews the review board's decision and order to determine whether it is supported by "substantial evidence" and whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A)-(E); <u>Blackburn v. Martin</u>, 982 F.2d 125, 128 (4th Cir. 1992). "Substantial evidence consists of such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."
Blackburn, 982 F.2d at 128 (internal quotes and citation omitted).

## A.

The employee provisions of each of the Acts under which Mrs. Williams brought claims prohibit an employer from discharging or otherwise discriminating against an employee because the employee engages in activities that are subject to protection under the Act. The Supreme Court set forth the shifting burdens for proving a case of discrimination in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and reaffirmed these principles in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

The plaintiff has the initial burden of establishing a prima facie case by a preponderance of the evidence. Burdine, 450 U.S. at 253-54. To establish a prima facie case of retaliatory discharge, the employee must prove that (1) the employee engaged in a protected activity; (2) the employer took an adverse action against the employee; and (3) a causal connection existed between the protected activity and the adverse action. Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998).

If the employee establishes a prima facie case, the burden shifts to the employer to provide sufficient evidence that the adverse action was taken for a legitimate, nondiscriminatory reason. Burdine, 450 U.S. at 253. "The defendant need not persuade

12

the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Burdine, 450 U.S. at 254 (citation omitted). If the employer meets this burden, the employee must show by a preponderance of the evidence that the legitimate reasons offered by the employer were actually a pretext for discrimination. Burdine, 450 U.S. at 253. Although the burden of production shifts, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

## B.

Mrs. Williams claims that the public expression of her concerns was protected activity and the System fired her, at least in part, for engaging in such activity. The Department of Labor (DOL) does not dispute that Mrs. Williams' initial whistleblowing was protected activity, and that the System knew of her protected activity. The DOL agrees that Mrs. Williams' initial whistleblowing was reasonable and protected. However, the DOL further asserts that, as found by the administrative law judge and the review board, once the school facilities were deemed safe, it was unreasonable for Mrs. Williams to allege they were unsafe. Moreover, the DOL claims that it was unreasonable and unprotected

13

activity for Mrs. Williams to distribute letters and fliers alleging unsafe school conditions, and to do so by making an unauthorized use of school address lists. Finally, DOL contends that in any event, the System had legitimate, nonretaliatory and nondiscriminatory grounds to dismiss Mrs. Williams.

The administrative law judge found, and the review board affirmed, that Mrs. Williams had engaged in many activities that the various Acts protect. However, the administrative law judge found that the System suspended Mrs. Williams because of the February 1999 letter she mailed to parents of students erroneously stating that drinking water in one of the schools contained lead. She had previously circulated similar letters in 1996 and 1997 containing unfounded and sensationalized allegations about lead and asbestos hazards at three other schools. The administrative law judge held that mailing these letters was not protected activity. The administrative law judge also held that even if Mrs. Williams' activities "were found to be protected activity . . . the record clearly establishes that" the System "had a legitimate and nondiscriminatory reason for its actions in suspending . . . and then dismissing her."

We are of opinion that the findings of the administrative law judge and the review board are supported by substantial evidence. Mrs. Williams' complaints centered around four schools. She first publicly expressed concerns about the potential safety hazards

presented by the renovation project at Fairmount. There is no disagreement that these complaints were "clearly protected activity within the meaning of the applicable statutes." In response, the System "undertook significant activity to ensure that the environment was safe, that any potential problems were corrected, and that a plan was in place to monitor the safety of the occupants during the renovation." The school was inspected numerous times by MOSH and the City Health Department and no violations were found. Mrs. Williams presented no credible evidence that hazards remained after the project was completed.

In response to Mrs. Williams' complaints about two other schools, James Mosher and Highlandtown, MOSH inspected each. No environmental hazards or violations were identified. At Southeast, her complaint about the safety of the drinking water was addressed by testing. The testing showed problems at only one fountain, which was supposed to be turned off. Again, steps were taken to ensure that any potential hazards were avoided by turning off all drinking fountains and providing bottled water. Important steps were taken at each school in response to Mrs. Williams' concerns to ensure the safety of students and staff in each building. Once her concerns were addressed, however, it was no longer reasonable for her to continue claiming that these schools were unsafe and her activities lost their character as protected activity.

15

Thus, when she mailed the February 1999 letter to parents of students, it would seem that her allegations were not grounded in a reasonable perception of an environmental hazard. The administrative law judge found that "the mailing of this letter was not protected activity, nor was the distribution of the fliers on the two previous occasions."

The System took adverse action against Mrs. Williams when it suspended her on March 1, 1999. Mrs. Williams, however, must at least raise an inference that protected activity was the likely reason for the adverse action, which she does not. Causey, 162 F.3d at 803. It is clear that the precipitating cause of action was the February 1999 letter to parents about lead in the water at Southeast, but as the administrative law judge found, this letter was not protected activity. Furthermore, even if this particular letter were protected,[4] the System has established that her suspension was motivated by legitimate and nondiscriminatory reasons. As the administrative law judge noted:

> With respect to the Claimant's dismissal, the Statement of Charges identifies three activities as the basis for the charge of misconduct: the circulation of the February 24, 1999 letter, the circulation of the December 3, 1996 letter to the Mayor about lead exposure at Fairmount, and the circulation of the letter (in the spring of 1997) about Fairmount, James Mosher, and

---

[4]Clearly the December 3, 1996 letter and the circulation of the flier in the spring of 1997 did not constitute protected activities since the System had adequately responded to Mrs. Williams' complaints, and investigations of the buildings had deemed them safe prior to each of those two activities.

> Highlandtown. . . . it is limited to that conduct on the part of the Claimant that caused disruption in the school system, by unnecessarily alarming parents and diverting school resources to respond to inquiries, when in fact the System had adequately responded to the concerns raised by the Claimant."

Indeed, Miss Jane Fields, the principal at Southeast, testified that, even if Mrs. Williams' allegations had some merit, she still would have recommended her suspension for obtaining unauthorized access to the list of names and addresses of parents. Thus, the System has set forth legitimate, nonretaliatory and nondiscriminatory reasons for Mrs. Williams' suspension and dismissal and Mrs. Williams has not established that these reasons were a pretext.

### III.

We are of opinion from our review of the record that the conclusion of the Secretary of Labor is based upon substantial evidence and is without reversible error. The administrative law judge and the review board did not err in finding that Mrs. Williams' whistleblowing actions were initially protected, but that once MOSH determined the schools were safe, Mrs. Williams' distribution of the letters and fliers was unprotected activity, giving the System legitimate grounds to dismiss her. Furthermore, even if the February 1999 letter does constitute protected activity, the administrative law judge did not err in holding that

17

the System set forth legitimate and nondiscriminatory reasons for Mrs. Williams' dismissal.

Accordingly, the decision of the Secretary of Labor is

**<u>AFFIRMED</u>**.

GREGORY, Circuit Judge, dissenting:

Exposure to lead contamination in older, unrenovated school buildings poses a serious threat to thousands of unsuspecting children. Diana Williams, a math teacher of eighteen years, recognized the danger of such exposure and was determined, in spite of her employer's unwillingness, to disclose this information to parents and teachers at her school. In so doing, she ultimately paid the price of her job. Ironically, the lesson taught by her dismissal, which this decision affirms, is that a teacher can care about her students, but not too much.

I strongly disagree with the majority's wholesale adoption of the findings made by the administrative law judge ("ALJ") in concluding that Williams's circulation of the letter dated February 24, 1999 ("February 24, 1999 Letter") was unprotected activity and that further, the Baltimore City Public School System ("School System") legitimately fired her for that action. Based on the evidence in the record, Williams reasonably relied on the independently-obtained, EPA-certified laboratory report, which identified dangerously high levels of lead contained in one of the water fountains at Southeast Middle School ("Southeast"). The chronology of the events indicates that the School System did not adequately respond to Williams's complaints prior to the circulation of the February 24, 1999 Letter. In addition, I find that the public interest in protecting children from imminent,

19

hazardous risks in an educational environment outweighs a school's interest in maintaining an atmosphere of order and trust. For the foregoing reasons, I respectfully dissent.

I.

The majority's opinion relies on the ALJ's findings of fact, which are, in my view, incomplete and inadequate when compared to the entire record. Accordingly, I shall recite the following relevant facts in full.

A.

In 1992-93, a study performed on all of the schools in the School System indicated that Southeast had lead contamination problems in certain water fountains. J.A. 116. According to the study, water fountains that showed unacceptable levels of lead in an initial diagnosis were tested a second time. Id. If the water fountains passed on the second test after being flushed, they were nevertheless required to be flushed each morning to clear up any lead buildup in the pipes. Id. If they failed, they were to be turned off. Id. Southeast responded to the study by shutting off certain defective water fountains and providing bottled water stations to faculty and students. J.A. 136.

Williams was assigned to work as a teacher at Southeast during the 1997-98 school year. J.A. 116. Williams noticed that the

20

staff had access to bottled water in the teachers' lounges, but that the students were still drinking from water fountains. Williams heard repeated rumors of lead contamination in the drinking water but initially did not want to become involved. J.A. 136. Eventually, Williams filed a complaint on January 1, 1999, with the Maryland Occupational Safety and Health Administration ("MOSH"). Id. MOSH transferred this complaint to the city's Health Department after determining that it lacked jurisdiction over the matter. Id. Williams made a follow-up telephone call to the Health Department shortly thereafter. Id.

Meanwhile, Williams independently took water samples from an unidentified water fountain and sent them to an EPA-certified laboratory in early January of 1999. J.A. 138. She subsequently received a report from the laboratory dated January 29, 1999, which identified hazardous levels of lead in the water samples. J.A. 138, 247. Williams called Jane Fields, the principal of Southeast, informing her that she had conclusive proof of dangerously high levels of lead in the drinking water, but Fields ignored her. J.A. 138.

On February 11, 1999, the Health Department inspected the water fountains in response to Williams's complaint and follow-up telephone call. J.A. 137. The Health Department issued a report dated February 11, 1999 ("February 11, 1999 Report"), which found that certain water fountains had low water pressure and

21

deterioration. J.A. 292. The Health Department also indicated that it would perform follow-up testing in two weeks. J.A. 293. However, the ALJ's conclusion that the Health Department had also taken water samples and determined that there was no lead contamination in the water at this time is unsupported by the record. See J.A. 137, 291-93, 305; Complainant's Ex. CX-139. Although the Health Department recommended that the water fountain stationed outside the main office be turned off, it based this determination on the faucet deterioration present in the water fountain. J.A. 249.

In response to the February 11, 1999, Report, Fields and Elam decided to shut off all of the water fountains because they frequently broke down. J.A. 261-62. Elam also increased the number of bottled water stations. Id. Ms. Fields requested repairs such as turning off water fountains and sinks located in the science laboratory. J.A. 138. There is no evidence showing that Williams or any students or parents at Southeast were aware of the February 11, 1999 Report or these changes at the time they were instated.

On February 24, 1999, Williams, feeling brushed aside by Fields, sent a letter to the parents of children enrolled at Southeast, which stated:

> PLEASE BE ADVISED THAT your child's school has lead in the drinking water. The process for testing lead in the drinking water was directed by an expert in lead abatement, who is certified and accredited by the

Maryland Department of Environment, and who is also trained, certified, and accredited to sample water for lead contamination.

The lead level in the water is higher than what is acceptable by the Environmental Protection Agency. Also, the fountains were turned off during the week of February 15, 1999 through February 19, 1999. Were you as parents made aware of such changes and informed as to why such changes were being made? Do you as parents feel that you are entitled to know why such changes were made? I strongly believe that the School System is obligated to inform you of such dramatic changes, along with providing you with a valid explanation, even if they have brought bottled water for the children to drink. . . .

Your child needs to be tested to see if he/sshe [sic] has been potentially exposed to lead. Please, don't wait too long to have your child tested because the lead only stays in your child's blood stream for about 6 to 8 weeks.

J.A. 240. Williams did not have permission to send the letter; nor did she have authorized access to the school's list of parents' addresses. J.A. 138-39, 143. In view of the overwhelming influx of telephone calls from understandably concerned parents in response to Williams's letter, Robert Booker, the superintendent of the School System, immediately suspended Williams without pay. J.A. 140-41.

The Health Department later issued a report dated March 15, 1999 ("March 15, 1999 Report"), which stated that water samples were taken on March 10, 1999. J.A. 305.[1] The March 15, 1999

---

[1]This recitation of the facts is more consistent with the findings of James L. Wiggins, the Hearing Examiner, who found that the Health Department did not sample the water until March 9, 1999 and did not issue a report until March 15, 1999 – two weeks after Williams had been suspended. See Complainant's Ex. CX-139. In his

Report identified dangerously high levels of lead contained in the water samples taken from the water fountain located outside the main office. J.A. 305, 324. Jack Elam, the building safety and education officer for the School System, testified that this water fountain was unaccountably operating when the Health Department checked in February of 1999. J.A. 150. The water fountain was subsequently shut off with all the other water fountains and then turned back on in March of 1999 for testing. J.A. 140, 150. In any event, the testing for this water fountain was "almost identical" to the results obtained by Williams. J.A. 150. Yet neither Williams nor any parents or students at Southeast were apprised of these results or the ensuing changes effected by Southeast.

## B.

The ALJ recommended dismissal of Williams's federal whistleblower claims pursuant to the Clean Water Act, 42 U.S.C. § 7622; Comprehensive Environmental Response, Compensation, and

---

findings of fact and conclusions of law issued pursuant to a full adversarial hearing, the Hearing Examiner determined that Williams's circulation of the February 24, 1999 Letter did not rise to the level of misconduct; that she had the right to file complaints regarding safety and health issues that generally affected the public; and that none of the students, parents or other staff members had complained regarding the February 24, 1999 Letter. Id. Accordingly, the Hearing Examiner ruled in Williams's favor and recommended that the School System not dismiss her. Id.

24

Liability Act, 42 U.S.C. § 9610; Federal Water Pollution Control Act, 33 U.S.C. § 1367; Safe Drinking Water Act, 42 U.S.C. § 300j-9; Solid Waste Disposal Act, 42 U.S.C. § 6971; and Toxic Substances Control Act, 15 U.S.C. § 2622 (collectively, "the Acts"). Specifically, the ALJ held that once the concerns raised by Williams had been addressed by the proper school authorities and state regulatory agencies, she could no longer reasonably claim that the schools were unsafe. The ALJ stated:

> At Southeast, again in response to rumors, the Claimant made a complaint to the Health Department about lead in the water. The Health Department responded promptly, making recommendations to turn off a fountain and add additional bottled water stations, but not citing the school for any lead problems. In response, the school system shut all of the fountains. The Claimant did not accept the results of this inspection, however, but relied on her own "expert" testing of the water from the fountain outside the main office. In fact, the results of her testing showed that although the lead level was high on the first sample, after flushing, it was at acceptable levels. But even if there were problems with the lead level in this fountain, they were addressed by turning it off, along with all of the other fountains. There could not be a potential for lead exposure if the water was not available to the students. Nevertheless, the Claimant circulated a letter to 500 parents, telling them that there was lead in their child's drinking water at school, and referring to the results of her testing, giving the impression that all of the water fountains had been tested as part of an official process, which found dangerous levels of lead in the water, when in fact it was the Claimant who was the "expert," and who had sampled one fountain. Furthermore, her statement that there was lead in the drinking water was simply erroneous, as all of the fountains had been turned off, and the students and staff were using bottled water. There was no reasonable basis for the Claimant's allegations.

25

J.A. 150-51. The ALJ thus concluded that Williams's "repeated, unfounded, and sensationalized missives to parents overstepped these bounds, and especially in light of the fact that her concerns had been addressed and responded to by every health and safety organization responsible for overseeing those concerns, her actions were manifestly indefensible." J.A. 157.

The administrative review board ("Board") agreed with the ALJ's determinations that (1) Williams had not engaged in protected activity by mailing the February 24, 1999 Letter which contained erroneous information; and (2) the School System's proffered reasons for her suspension – her unauthorized use of names and addresses of parents and the attendant disruption caused by the circulation of the letter – were legitimate and nondiscriminatory.

II.

A.

We may set aside the Board's determination if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or unsupported by "substantial evidence." 5 U.S.C. § 706(2)(A), (E). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Blackburn v. Martin, 982 F.2d 125, 128 (4th Cir. 1992) (internal quotations and citations omitted). In applying this standard, we examine the entirety of the record,

including the ALJ's decision and any contrary evidence. <u>Id.</u> (internal citations omitted). While de novo review is inappropriate, the substantial evidence standard nevertheless requires us to "weigh whatever in the record fairly detracts from the Board's factfinding as well as evidence that supports it." <u>Dorsey Trailers, Inc. v. NLRB</u>, 233 F.3d 831, 839-40 (4th Cir. 2000).

B.

Federal whistleblower provisions are "intended to promote a working environment in which employees are relatively free from the debilitating threat of employment reprisals for publicly asserting company violations of statutes protecting the environment . . . ." <u>Passaic Valley Sewerage Commissioners v. United States Dep't of Labor</u>, 992 F.2d 474, 478 (3d Cir. 1993). As this Circuit has already noted, federal safety legislation, including whistleblower statutes, should be "broadly construed" to effectuate their congressional purpose. <u>Rayner v. Smirl</u>, 873 F.2d 60, 63 (4th Cir. 1989) (interpreting Federal Railroad Safety Authorization Act to protect whistleblowers in making intra-corporate complaints even though the act itself did not explicitly provide such protection).

In the present appeal, the Acts which form the predicate for Williams's federal whistleblower claims contain virtually identical language. For instance, the Water Pollution Control Act states:

27

> No person shall fire, or in any way discriminate against, or cause to be fired or discriminated against, any employee or any authorized representative of employees by reason of fact that such employee . . . has filed, instituted, or caused to be filed or instituted any proceeding under this chapter . . . or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter . . . .

33 U.S.C. § 1367; see also 42 U.S.C. § 7622; 42 U.S.C. § 9610; 42 U.S.C. § 300j-9; 42 U.S.C. § 6971; 15 U.S.C. § 2622. Section 24.1 of Title 29 of the Code of Federal Regulations implements the employee protection provisions enacted in these statutes. See 29 C.F.R. § 24.1 et seq.

A plaintiff claiming retaliatory discharge under these whistleblower statutes must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) she suffered an adverse employment action; and (4) a causal connection existed between the protected activity and the adverse action. Hooven-Lewis v. Caldera, 249 F.3d 259, 272 (4th Cir. 2001) (retaliatory discharge under Title VII); Simon v. Simmons Foods, Inc., 49 F.3d 386, 389 (8th Cir. 1995) (retaliatory discharge under Toxic Substances Control Act, Water Pollution Control Act, Solid Waste Disposal Act, and the Clean Air Act). In showing that the whistleblowing activity was protected, the plaintiff must establish that her allegations were based on a good faith, reasonable belief that the employer engaged in safety violations. See Passaic Valley, 992 F.2d at 478 ("employees must be free from threats to

28

their job security in retaliation for their good faith assertions of corporate violations of the statute."); <u>Love v. RE/MAX of Am., Inc.</u>, 738 F.2d 383, 385 (10th Cir. 1984) (activity protected even if it is "based on a mistaken good faith belief that Title VII has been violated"); <u>Johnson v. Old Dominion Sec.</u>, No. 86-CAA-3, 1991 WL 733576, at *6 (Sec'y May 29, 1991) (activity protected so long as it is "grounded in conditions constituting reasonably perceived violations . . ."). Moreover, whistleblower protection does not turn on whether the plaintiff is "<u>actually</u> successful in proving a violation of a federal safety regulation." <u>Yellow Freight Sys., Inc. v. Martin</u>, 954 F.2d 353, 357 (6th Cir. 1992) (emphasis in original).

C.

The majority largely adopts the reasoning of the ALJ in finding that the February 24, 1999 Letter was not protected activity under the first step of the analysis. Op. at 16. The ALJ concluded that otherwise protected activity becomes unprotected where "the perceived hazard has been investigated by responsible management officials, and if found safe, adequately explained to the employee." J.A. 34; <u>see</u> <u>Sutherland v. Spray Sys. Envtl.</u>, No. 95-CAA-1, electronic slip. op. at 2-3 (Sec'y Feb. 26, 1996); <u>Stockdill v. Catalytic Indus. Maint. Co., Inc.</u>, No. 90-ERA-43, 1996 WL 171409, at *1 (Sec'y Jan. 24, 1996). Because school authorities

29

at Southeast and the Health Department had eventually addressed Williams's complaint, the ALJ determined that her circulation of the February 24, 1999 Letter to parents at Southeast claiming that the water fountains contained dangerous levels of lead was unprotected activity. Even under this theory, however, the ALJ's conclusion erroneously misconstrues and glosses over critical facts contained in the record.

First, the chronology of events indicates that the School System had not fully investigated lead contamination issues in the water fountains until after Williams had circulated the February 24, 1999 Letter. Williams conducted an independent study of the defective water fountain in early January of 1999, sending the samples to an EPA-certified laboratory. There is no dispute that the samples originated from the water fountain located outside the main office at Southeast and that further, the water fountain, for whatever reason, was operating and accessible to students.

The laboratory subsequently released a report dated January 29, 1999, identifying hazardous levels of lead in the samples obtained from the water fountain. While it is true that the Health Department undertook some efforts to test water fountains, the February 11, 1999 Report demonstrates that the Health Department merely checked the faucets and water pressure. That report itself states explicitly that the Health Department would return for retesting. Indeed, the Health Department did not take water

30

samples until March 10, 1999. Nor did it release its findings until March 15, 1999 – nearly two weeks after Williams had been suspended.[2] Thus, at the time that Williams circulated the February 24, 1999 Letter, she had no reason to question the results of the laboratory report, which formed a good faith, reasonable basis for her belief that the water fountains at Southeast contained lead contamination.

Second, the March 15, 1999 Report confirmed the results of Williams's laboratory report insofar as the drinking water in at least one of the water fountains at Southeast contained dangerously high levels of lead on the first flush. While both reports revealed that the drinking water yielded acceptable results after the first flush, the ALJ ignored the system-wide requirement that water fountains which failed the first test but passed after flushing were required to be flushed each morning to clear any lead buildup in the pipes. As such, even water fountains which yielded acceptable results on the second try were not necessarily safe by the School System's own standards. Significantly, contrary to what the ALJ suggests, the Health Department did not conclude that the water fountain was safe or that the precautionary measure of flushing the water fountain would be sufficient to address the problem. Instead, the Health Department explicitly recommended

_____

[2]The individualized report on the water fountain in question indicates that the earliest possible date on which the problems could have been reported was March 12, 1999. J.A. 324.

31

that the water fountain be turned off even <u>before</u> the water sampling had been conducted – a course of conduct which both Fields and Elam accepted.

To be sure, Fields and Elam shut off all water fountains prior to Williams's circulation of the February 24, 1999 Letter, thereby foreclosing the possibility of <u>future</u> exposure to lead contamination. Yet, this action did not address any <u>past</u> exposure to lead contamination, which posed a continuous threat to students' health and welfare. As such, the harms presented by past exposure to lead contamination, which Williams sought to address through student testing, were still extant.

Third, the School System never attempted to engage Williams in any discussion regarding the lead levels contained in the water fountains. Williams approached Fields to discuss the results contained in the laboratory report, but Fields rebuffed those efforts and evinced an utter lack of concern. Furthermore, the record is bereft of any evidence showing that Williams was ever apprised of the February 11, 1999 Report; the March 15, 1999 Report; or the reasons behind Fields's decision to turn off all the water fountains at Southeast. Despite the objective findings of the March 15, 1999 Report, which virtually concurred with the results of Williams's laboratory report, the School System never explained to Williams why exposure to lead contamination no longer endangered the students at Southeast. Neither did the School

32

System explain to Williams what steps had been taken to abate the lead contamination problem. It therefore cannot be said that the School System discharged its duty in informing Williams why her continued complaints – at least with respect to past exposure to lead contamination – were unjustified. See Sutherland, No. 95-CAA-1, electronic slip. op. at 3 (finding that once employees complained of unsafe working conditions, employer had a duty to meet with employees and adequately explain why the conditions were safe; "Had Smith adequately explained to the Complainants that the partial containment procedure was safe, the refusal to work would have lost its protection.").

To the extent that the ALJ purports to discredit Williams based on her perceived fragile mental state, such considerations are irrelevant to the reasonableness standard which applies to determine whether an employee's conduct is protected. See e.g., Munsey v. Fed. Mine Safety & Health Sewerage Commissioners, 595 F.2d 735, 742 (D.C. Cir. 1978) (rejecting requirement that miners demonstrate their state of mind or the merit of their complaints). Taking the facts as they were known to Williams at the time she circulated the February 24, 1999 Letter, I find that Williams's reliance on the laboratory report formed a reasonable basis for her belief that the drinking water accessible to students contained lead contamination.

33

D.

The majority nevertheless concludes that the School System set forth legitimate, non-retaliatory reasons for dismissing Williams based on the ALJ's determination that she obtained unauthorized access to the list of names and addresses of parents and created disruptions in Southeast's administrative affairs. Op. at 16. Relying on NLRB v. Truck Drivers, Oil Drivers, Filing Station and Platform Workers Union, Local 705, 630 F.2d 505 (7th Cir. 1980), the ALJ found that Williams's unauthorized contact with Southeast parents was "indefensible" in light of the School System's interest in maintaining an orderly environment for the education of children and an atmosphere of trust with their parents. J.A. 157.

In Truck Drivers, two employees were dismissed as business representatives on behalf of their union because they had discussed their wage complaints over their employer's radio. Truck Drivers, 630 F.2d at 506. The Seventh Circuit declared that merely characterizing the employees' conduct as "wage demands" without considering the time, manner and place of such demands was improper. Id. at 508. Specifically, the court stated:

> If the "thrust" of the employees' actions were [sic] here toward obtaining salary increases for themselves and other members of the union staff, their right to petition for wage increases must nonetheless be balanced against the employer's right to expect a basic loyalty on the part of employees in the performance of their assigned duties.

34

Id. at 508. Because the employees had blatantly disregarded established procedures for processing wage complaints and engaged in poor work performance, the court found that the dismissals were appropriate and non-retaliatory. Id. at 508-09. Truck Drivers thus stands for the proposition that an employee does not have the absolute right to engage in insubordination even if some of those acts implicate protected activities on his own behalf. Id. at 508; see NLRB v. International Broth. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers, and Helpers, 581 F.2d 473, 478 (5th Cir. 1978) ("To hold that a union has no right to discharge an employee for insubordination . . . would, we believe, seriously detract from effective, cohesive union leadership.")

Truck Drivers is distinguishable from the present appeal for several reasons. Williams attempted to avail herself of the proper channels for reporting environmental violations – first, through MOSH and the Health Department, and second, through Fields. MOSH denied jurisdiction over her complaint and transferred it to the Health Department; the Health Department did not take water samples until more than two months had passed; and Fields directly ignored and rebuffed Williams's efforts to inform her of the problem. Clearly, the channels for reporting such complaints were not effective, particularly in light of the imminent and continuing danger posed to the students at Southeast.

Moreover, this is not a case in which Williams sought to harass the School System into awarding benefits to herself, as in Truck Drivers. Rather, Williams was determined to make the specific children and parents affected by the cognizable health risks present in the school aware of those immediate dangers. While the ALJ viewed Williams as being an overly zealous crusader who repeatedly annoyed the School System, her efforts time and again forced positive changes and were far from frivolous.

Finally, the employer's right to be free from disruptions and interferences in the daily administration of its affairs is not absolute; the entire purpose of federal whistleblower statutes is to protect employees who seek to uncover violations that strike at the heart of public safety. Particularly where public safety risks to children are involved, whistleblower activities designed to expose such risks should be unsettling, disruptive, and frightening, so as to inspire positive change.

The mere fact that Southeast became inundated with telephone calls from concerned parents does not mean that the School System's interest in maintaining an educational environment of order and trust should override the public interest in ensuring the safety of unsuspecting children. Despite receiving objective findings of lead contamination in the drinking water which had been accessible to students at some point, the School System never told students or parents about the risk of exposure to lead contamination or the

36

steps undertaken to abate the exposure to such contamination. Upon receiving Williams's letter, parents understandably began calling administrative officials at Southeast, distressed mostly because the School System itself had never disclosed the existence of recurring lead contamination issues. Significantly, no parent, student or staff member ever complained about receiving this information. Nor did any of the parents take drastic measures such as keeping their children out of school, calling for the resignation of staff members, or even protesting – a testament, perhaps, to the trust they placed in Southeast's administration and specifically, Fields.[3]

In my view, the School System's professed interest in maintaining order and trust appears disingenuous in light of its failure to disclose risks inherent in past exposure to lead contamination and the need for student testing, even if future exposure to lead contamination had been addressed. Moreover, the School System could have avoided the disruption in the administration of its affairs by informing students and parents in the first instance. Instead, the School System retaliated against Williams because she informed parents about the serious risks posed to students from past exposure to lead contamination, thereby

---

[3]At least two parents insisted on speaking directly to Fields, and not to an assistant principal or secretary, because they "trusted" her. J.A. 265-66. One of the parents expressed her distress at the fact that the letter had not originated from Southeast itself. J.A. 265.

37

embarrassing administrative officials. As such, the School System did not dismiss Williams merely because she used an unauthorized list to contact parents or created disruptions in Southeast's administrative affairs.

Despite the majority's best efforts to view the protected nature of Williams's activities and the legitimacy of the School System's proferred reasons for her dismissal as distinct issues, the underlying facts indicate that the issues cannot be so easily uncoupled. It is true that Field testified that "even if she believed the Respondent was correct in her allegations regarding lead in the water, she would have still recommended the Respondent's suspension without pay because of the disruption cause[d] at the school." Complainant's CX-139. However, it is also undisputed that her supervisor, Dr. Patricia Abernathy, the Area Executive Officer for the Southeast area, testified that "if she had determined that there was some validity to the Respondent's allegations, she may have recommended a different disciplinary action." Id. (emphasis added). Similarly, Sandra Wighton, the Assistant Superintendent for the Southeast area, "confirmed that, even if there were merit to [Williams's] claims, she still would have recommended some form of discipline, although the form of that discipline may have been different." J.A. 155 (emphasis added).

As such, two high-ranking officials in the School System admitted that the decision to dismiss Williams was based, in part,

on the validity of her allegations, which were ultimately substantiated by the School System's own report. Moreover, Booker's recommendation that Williams be dismissed explicitly relied on Dr. Abernathy's formal recommendation on April 26, 1999, which was more than a month after the release of the March 15, 1999 Report. J.A. 246. Accordingly, I conclude that the School System failed to proffer a legitimate, non-retaliatory reason for dismissing Williams.

I fear that today's decision unwittingly discourages employees from disclosing information reasonably intended to protect the vulnerable when their employers are unwilling to do so. Because I conclude that Williams engaged in protected activity and that the School System failed to proffer a legitimate, non-retaliatory reason for her dismissal, I respectfully dissent.