630 F.2d 505
 105 L.R.R.M. (BNA) 2610, 89 Lab.Cas. P 12,239
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
TRUCK DRIVERS, OIL DRIVERS, FILLING STATION AND PLATFORM
WORKERS UNION, LOCAL 705, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF
AMERICA, Respondent.
 No. 79-2348.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 29, 1980.
Decided Sept. 3, 1980.
 
 Joseph Schwachter, NLRB, Washington, D. C., for petitioner.
 Sheldon M. Charone, Carmell & Charone Ltd., Chicago, Ill., for respondent.
 Before WOOD and CUDAHY, Circuit Judges, and MARKEY, Chief Judge.*
 MARKEY, Chief Judge.
 
 
 1
 The National Labor Relations Board (NLRB) petitions for enforcement of its order against the Truck Drivers, Oil Drivers, Filling Station and Platform Workers Union, Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union) directing reinstatement and back pay for George Gilmer and James Jackson. Enforcement denied.
 
 Background
 
 2
 Gilmer and Jackson were dismissed from their jobs as business representatives of the Union on April 11, 1977. The Union says they were dismissed for poor job performance, for engaging in personal business during work time, and for insubordinate conduct. The NLRB says Gilmer and Jackson were dismissed while participating in activities protected by the National Labor Relations Act, 29 U.S.C. § 151, et seq.
 
 
 3
 On April 4, 1977, at a monthly Union stewards meeting attended by members of the Union's executive board, its business representatives and stewards from the shops the Union had organized, Jackson asked Peick, the executive officer of the Union, for permission to speak. Obtaining Peick's permission, Jackson began discussing the wages paid the Union staff and requested pay increases for the entire staff. Peick told Jackson that a shop stewards meeting was not the proper time or place to discuss staff salaries. Peick then asked Gilmer if he was involved in the request and was told by Gilmer that he was. Witnesses for the Union testified that Peick told the two men to discuss their salaries with the Union's executive board if they were unhappy. As the meeting ended, Peick asked the two men to be in his office the next morning at 8 a. m. Gilmer and Jackson did not contest that description of events, but testified Peick became angry and told them they were fired at the meeting.
 
 
 4
 A member of the executive board testified that he heard Gilmer and Jackson discussing their wage complaints over the company CB radio and that he interrupted, telling them the CBs were not to be used for such purposes, and that if they had complaints they should see Peick personally. Gilmer and Jackson did not deny that testimony, but testified they heard Peick talking by radio to members of the executive board after the meeting and that he said he was going to "straighten out this black bastard once and for all."[1]
 
 
 5
 On the morning of April 5, Gilmer and Jackson, meeting with Peick and other members of the executive board, were told not to use the radios for personal business and that they would get a raise when they earned one.
 
 
 6
 On April 11, 1977, during a political luncheon honoring Chicago's Mayor Bilandic at a hotel, Gilmer and Jackson distributed a letter repeating their wage demands to members of the executive board seated at various tables with other attendees.
 
 
 7
 After returning from the luncheon, the board reviewed the work records of Gilmer and Jackson and recommended to Peick that they be dismissed. Peick discharged them that afternoon, telling them they were fired for insubordination. Gilmer's and Jackson's work records reveal both had been remiss in their duties in the past, culminating in a December, 1976 board recommendation that they be dismissed, with Peick deciding instead to issue a warning and give the two men a "second chance."
 
 
 8
 After their discharge, Gilmer and Jackson picketed the Union's offices repeatedly from May through November 1977. In July, Gilmer and Jackson, posing with picket signs, met with a television news crew in front of Peick's home. In September, Gilmer and Jackson placed picket signs in front of Peick's house and distributed pamphlets to Peick's neighbors. The pamphlets contained a cartoon of Peick, whip in one hand, standing on a prostrate Gilmer while strangling Jackson with his other hand.
 
 
 9
 In October and November, at the Union hall and at job sites of Union-represented employees, Gilmer and Jackson handed out leaflets concerning a suit by another Union employee involving Peick and the Union's Pension Fund. The leaflet contained this statement:
 
 UNION BOSS ROBS AND STEALS FROM UNION MEMBERS
 
 10
 LOUIS F. PEICK-SEC. TREAS. OF LOCAL # 705 HAVE (sic) NOT STOPPED STEALING AND ROBBING FROM MEMBERS YET!!! HE ROBBED AND STOLE MR. JACKSON (sic) AND MR. GILMER'S PENSION: HEALTH AND WELFARE AS WELL AS THEIR LIVELIHOOD. YOUR UNION AGENT WOULD LIKE TO SERVE YOU MORE BUT, HE CAN'T DO ANYMORE THAN MR. LOUIS F. PEICK LET (sic) HIM. CALL MR. PEICK AT 738-2800 AND CHECK YOUR PENSION.[2]
 
 
 11
 On September 27, 1977, Gilmer and Jackson filed unfair labor practice charges with the NLRB. After a hearing, the NLRB Administrative Law Judge ruled that they had been engaged in protected activity at the time of their dismissal and ordered their reinstatement and reimbursement for back pay. The NLRB adopted that opinion with minor modification.[3]
 
 OPINION
 
 12
 An order of the NLRB will be enforced by this court if there is substantial evidence in the record supporting it. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); NLRB v. Gogin, 575 F.2d 596, 601 (7th Cir. 1978); Electri-Flex Co. v. NLRB, 570 F.2d 1327, 1331 (7th Cir.), cert. denied, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978). Fear of an accusation that it is substituting its judgment for that of NLRB should not, however, so enervate a court as to substitute judicial abdication for judicial review. See Liberty Mutual Insurance Co. v. NLRB, 592 F.2d 595, 602 (1st Cir. 1979).
 
 
 13
 The Administrative Law Judge (ALJ) found that Gilmer and Jackson were engaged in "concerted activities concerning terms and conditions of employment," and would not have been fired "but for" those activities. Viewing the "plain thrust" of those activities as an effort to "obtain wage relief," the ALJ dismissed the argument that the wage complaints were inappropriately presented, finding "no reasonable basis for withholding the normal protections accorded such activity."
 
 
 14
 The actions of Gilmer and Jackson were among the events involved in their dismissals, but we cannot find that those actions, taken as a whole, were merely "concerted activities for the purpose of collective bargaining or other mutual aid or protection" protected by Section 7 of the National Labor Relations Act, or that the wage demand element in those actions so influenced the dismissals as to achieve "but for" status. Nor can it be said that a mere characterization as related to wage demands requires a total disregard of the time, place, and manner in which the demands were made, or of the job performances of the dismissees.
 
 
 15
 This case does not involve an employer engaged in anti-union activity, nor does it involve employee dismissal for attempted union organizing. If the "thrust" of the employees' actions were here toward obtaining salary increases for themselves and other members of the union staff, their right to petition for wage increases must nonetheless be balanced against the employer's right to expect a basic loyalty on the part of employees in the performance of their assigned duties. See NLRB v. International Brotherhood of Boilermakers, 581 F.2d 473, 478 (5th Cir. 1978).
 
 
 16
 Whatever balancing process may or may not have been here performed by the ALJ and the NLRB, articulated or sub silentio, we do not find substantial evidence that either engaged in the required balancing process. That wage demands were denied without discharge on April 5 would tend to negate hostility of the Union toward wage demands alone. That wage demands were made does not conflict with a dismissal for poor performance, for conducting personal business during work time, and for insubordination. The balancing process requires more than a talismanic approach based on the mere articulation of a wage demand.
 
 
 17
 That employees are protected while presenting wage complaints does not give them carte blanche in choosing the method of presentation, or in their choice of time and place for making those complaints. Gilmer and Jackson had been employed by the Union for 14 and 8 years, respectively. They were fully informed of the established procedure to follow in seeking wage increases. They had attended earlier stewards meetings and knew the purpose of those meetings. Yet they elected to disregard established procedures and to present wage complaints at a meeting attended by stewards who are not employed by the Union, to the potential embarrassment of the Union and its leader who was conducting the meeting. Nonetheless, the Union leader met with them the next morning and told them they would be given a raise when their work indicated they deserved it. Six days later they again disregarded established procedures and passed out wage complaint letters to the board members at the Bilandic luncheon, again to the potential embarrassment of the Union.[4]
 
 
 18
 Thus the substantial evidence in the record not only fails to support the NLRB order but illumines justification for the dismissals involved. The injection of salary complaints at the stewards meeting, the admittedly improper use of the CB radios, the presentation of wage complaint letters at a civic luncheon, the general and repeated failure and refusal to follow established, proper, and known procedures for presenting wage complaints, coupled with the poor prior work records of Gilmer and Jackson, for which they had been given prior warnings and a "second chance," formed what the ALJ called "a reasonable basis for withholding the normal protections accorded" to wage relief activity. When the entire panorama of events, not just the goals expressed, is viewed, it is clear that those events constituted adequate and justifiable grounds for the present dismissals.
 
 
 19
 The Union "went along," but with a warning, after the earlier discussion of poor performance. It "went along," but with a reminder of impropriety, after the stewards meeting. It "went along" after the CB radio warning. The luncheon event was the final straw. An employer should not be penalized for good-heartedness with employees who choose to flout its rules and ignore its warnings. The National Labor Relations Act is directed toward recognition of the legitimate rights of both employers and employees, 29 U.S.C. § 141(a). There must be room in the law for a right of an employer somewhere, some time, at some stage, to free itself of continuing, unproductive, internal, and improper harassment.[5]
 
 
 20
 The NLRB failed to consider the legitimate business interest of the Union involved in its dismissal of Gilmer and Jackson, Liberty Mutual Insurance Co. v. NLRB, 592 F.2d 595, 602 (1st Cir. 1979), or to balance the employee's right to petition against the employer's right to performance of assigned duties in a loyal manner, NLRB v. International Brotherhood of Boilermakers, 581 F.2d at 478.
 
 
 21
 Because we find the dismissals were justified and not in retaliation for protected activity, enforcement of the NLRB order is denied.
 
 
 22
 Enforcement denied.
 
 
 
 *
 Honorable Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, is sitting by designation
 
 
 [1]
 That allegation did not appear in the affidavits filed with the NLRB by Gilmer and Jackson
 
 
 [2]
 Peick sued Gilmer and Jackson for libel based on that statement and was awarded summary judgment on the issue of liability, Peick v. Gilmer and Jackson, 78 L. 5014, Circuit Court of Cook County, Illinois
 
 
 [3]
 Because we hold the NLRB order unsupported by substantial evidence that the discharge was unjustified, we do not reach the question of whether reinstatement was appropriate. Nor is there need to discuss the post-discharge activities of Gilmer and Jackson
 
 
 [4]
 Gilmer and Jackson say they didn't show the letters to other civic leaders seated with each board member, but cite no adequate reason for ignoring and by-passing normal channels, e. g., the U. S. Postal Service
 
 
 [5]
 That the employer here is a union is of no moment. No reason appears for viewing, or applying, the law differently in relation to different employers