GREGORY, Circuit Judge,
dissenting.
Exposure to lead contamination in older, unrenovated school buildings poses a serious threat to thousands of unsuspecting children. Diana Williams, a math teacher of eighteen years, recognized the danger of such exposure and was determined, in spite of her employer’s unwillingness, to disclose this information to parents and teachers at her school. In so doing, she ultimately paid the price of her job. Ironically, the lesson taught by her dismissal, which this decision affirms, is that a teacher can care about her students, but not too much.
I strongly disagree with the majority’s wholesale adoption of the findings made by the administrative law judge (“ALJ”) in concluding that Williams’s circulation of the letter dated February 24, 1999 (“February 24, 1999 Letter”) was unprotected activity and that further, the Baltimore City Public School System (“School System”) legitimately fired her for that action. Based on the evidence in the record, Williams reasonably relied on the independently-obtained, EPA-certified laboratory report, which identified dangerously high levels of lead contained in one of the water *572 fountains at Southeast Middle School (“Southeast”). The chronology of the events indicates that the School System did not adequately respond to Williams’s complaints prior to the circulation of the February 24, 1999 Letter. In addition, I find that the public interest in protecting children from imminent, hazardous risks in an educational environment outweighs a school’s interest in maintaining an atmosphere of order and trust. For the foregoing reasons, I respectfully dissent.
I.
The majority’s opinion relies on the ALJ’s findings of fact, which are, in my view, incomplete and inadequate when compared to the entire record. Accordingly, I shall recite the following relevant facts in full.
A.
In 1992-93, a study performed on all of the schools in the School System indicated that Southeast had lead contamination problems in certain water fountains. J.A. 116. According to the study, water fountains that showed unacceptable levels of lead in an initial diagnosis were tested a second time. Id. If the water fountains passed on the second test after being flushed, they were nevertheless required to be flushed each morning to clear up any lead buildup in the pipes. Id. If they failed, they were to be turned off. Id. Southeast responded to the study by shutting off certain defective water fountains and providing bottled water stations to faculty and students. J.A. 136.
Williams was assigned to work as a teacher at Southeast during the 1997-98 school year. J.A. 116. Williams noticed that the staff had access to bottled water in the teachers’ lounges, but that the students were still drinking from water fountains. Williams heard repeated rumors of lead contamination in the drinking water but initially did not want to become involved. J.A. 136. Eventually, Williams filed a complaint on January 1, 1999, with the Maryland Occupational Safety and Health Administration (“MOSH”). Id. MOSH transferred this complaint to the city’s Health Department after determining that it lacked jurisdiction over the matter. Id. Williams made a follow-up telephone call to the Health Department shortly thereafter. Id.
Meanwhile, Williams independently took water samples from an unidentified water fountain and sent them to an EPA-certified laboratory in early January of 1999. J.A. 138. She subsequently received a report from the laboratory dated January 29, 1999, which identified hazardous levels of lead in the water samples. J.A. 138, 247. Williams called Jane Fields, the principal of Southeast, informing her that she had conclusive proof of dangerously high levels of lead in the drinking water, but Fields ignored her. J.A. 138.
On February 11, 1999, the Health Department inspected the water fountains in response to Williams’s complaint and follow-up telephone call. J.A. 137. The Health Department issued a report dated February 11, 1999 (“February 11, 1999 Report”), which found that certain water fountains had low water pressure and deterioration. J.A. 292. The Health Department also indicated that it would perform follow-up testing in two weeks. J.A. 293. However, the ALJ’s conclusion that the Health Department had also taken water samples and determined that there was no lead contamination in the water at this time is unsupported by the record. See J.A. 137, 291-93, 305; Complainant’s Ex. CX-139. Although the Health Department recommended that the water fountain stationed outside the main office be turned off, it based this determination on *573 the faucet deterioration present in the water fountain. J.A. 249.
In response to the February 11, 1999, Report, Fields and Elam decided to shut off all of the water fountains because they frequently broke down. J.A. 261-62. Elam also increased the number of bottled water stations. Id. Ms. Fields requested repairs such as turning off water fountains and sinks located in the science laboratory. J.A. 138. There is no evidence showing that Williams or any students or parents at Southeast were aware of the February 11, 1999 Report or these changes at the time they were instated.
On February 24, 1999, Williams, feeling brushed aside by Fields, sent a letter to the parents of children enrolled at Southeast, which stated:
PLEASE BE ADVISED THAT your child’s school has lead in the drinking water. The process for testing lead in the drinking water was directed by an expert in lead abatement, who is certified and accredited by the Maryland Department of Environment, and who is also trained, certified, and accredited to sample water for lead contamination.
The lead level in the water is higher than what is acceptable by the Environmental Protection Agency. Also, the fountains were turned off during the week of February 15,1999 through February 19, 1999. Were you as parents made aware of such changes and informed as to why such changes were being made? Do you as parents feel that you are entitled to know why such changes were made? I strongly believe that the School System is obligated to inform you of such dramatic changes, along with providing you with a valid explanation, even if they have brought bottled water for the children to drink....
Your child needs to be tested to see if he/she [sic] has been potentially exposed to lead. Please, don’t wait too long to have your child tested because the lead only stays in your child’s blood stream for about 6 to 8 weeks.
J.A. 240. Williams did not have permission to send the letter; nor did she have authorized access to the school’s list of parents’ addresses. J.A. 138-39, 143. In view of the overwhelming influx of telephone calls from understandably concerned parents in response to Williams’s letter, Robert Booker, the superintendent of the School System, immediately suspended Williams without pay. J.A. 140-41.
The Health Department later issued a report dated March 15, 1999 (“March 15, 1999 Report”), which stated that water samples were taken on March 10, 1999. J.A. 305.[1] The March 15, 1999 Report identified dangerously high levels of lead contained in the water samples taken from the water fountain located outside the main office. J.A. 305, 324. Jack Elam, the building safety and education officer *574 for the School System, testified that this water fountain was unaccountably operating when the Health Department checked in February of 1999. J.A. 150. The water fountain was subsequently shut off with all the other water fountains and then turned back on in March of 1999 for testing. J.A. 140, 150. In any event, the testing for this water fountain was “almost identical” to the results obtained by Williams. J.A. 150. Yet neither Williams nor any parents or students at Southeast were apprised of these results or the ensuing changes effected by Southeast.
B.
The ALJ recommended dismissal of Williams’s federal whistleblower claims pursuant to the Clean Water Act, 42 U.S.C. § 7622; Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9610; Federal Water Pollution Control Act, 33 U.S.C. § 1367; Safe Drinking Water Act, 42 U.S.C. § 300j-9; Solid Waste Disposal Act, 42 U.S.C. § 6971; and Toxic Substances Control Act, 15 U.S.C. § 2622 (collectively, “the Acts”). Specifically, the ALJ held that once the concerns raised by Williams had been addressed by the proper school authorities and state regulatory agencies, she could no longer reasonably claim that the schools were unsafe. The ALJ stated:
At Southeast, again in response to rumors, the Claimant made a complaint to the Health Department about lead in the water. The Health Department responded promptly, making recommendations to turn off a fountain and add additional bottled water stations, but not citing the school for any lead problems. In response, the school system shut all of the fountains. The Claimant did not accept the results of this inspection, however, but relied on her own “expert” testing of the water from the fountain outside the main office. In fact, the results of her testing showed that although the lead level was high on the first sample, after flushing, it was at acceptable levels. But even if there were problems with the lead level in this fountain, they were addressed by turning it off, along with all of the other fountains. There could not be a potential for lead exposure if the water was not available to the students. Nevertheless, the Claimant circulated a letter to 500 parents, telling them that there was lead in their child’s drinking water at school, and referring to the results of her testing, giving the impression that all of the water fountains had been tested as part of an official process, which found dangerous levels of lead in the water, when in fact it was the Claimant who was the “expert,” and who had sampled one fountain. Furthermore, her statement that there was lead in the drinking water was simply erroneous, as all of the fountains had been turned off, and the students and staff were using bottled water. There was no reasonable basis for the Claimant’s allegations.
J.A. 150-51. The ALJ thus concluded that Williams’s “repeated, unfounded, and sensationalized missives to parents overstepped these bounds, and especially in light of the fact that her concerns had been addressed and responded to by every health and safety organization responsible for overseeing those concerns, her actions were manifestly indefensible.” J.A. 157.
The administrative review board (“Board”) agreed with the ALJ’s determinations that (1) Williams had not engaged in protected activity by mailing the February 24, 1999 Letter which contained erroneous information; and (2) the School System’s proffered reasons for her suspension — her unauthorized use of names *575 and addresses of parents and the attendant disruption caused by the circulation of the letter — were legitimate and nondiscriminatory.
II.
A.
We may set aside the Board’s determination if it is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,” or unsupported by “substantial evidence.” 5 U.S.C. § 706(2)(A), (E). Substantial evidence consists of “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Blackburn v. Martin, 982 F.2d 125, 128 (4th Cir.1992) (internal quotations and citations omitted). In applying this standard, we examine the entirety of the record, including the ALJ’s decision and any contrary evidence. Id. (internal citations omitted). While de novo review is inappropriate, the substantial evidence standard nevertheless requires us to “weigh whatever in the record fairly detracts from the Board’s factfinding as well as evidence that supports it.” Dorsey Trailers, Inc. v. NLRB, 233 F.3d 831, 839-40 (4th Cir.2000).
B.
Federal whistleblower provisions are “intended to promote a working environment in which employees are relatively free from the debilitating threat of employment reprisals for publicly asserting company violations of statutes protecting the environment....” Passaic Valley Sewerage Commissioners v. United States Dep’t of Labor, 992 F.2d 474, 478 (3d Cir. 1993). As this Circuit has already noted, federal safety legislation, including whistleblower statutes, should be “broadly construed” to effectuate their congressional purpose. Rayner v. Smirl, 873 F.2d 60, 63 (4th Cir.1989) (interpreting Federal Railroad Safety Authorization Act to protect whistleblowers in making intra-corporate complaints even though the act itself did not explicitly provide such protection).
In the present appeal, the Acts which form the predicate for Williams’s federal whistleblower claims contain virtually identical language. For instance, the Water Pollution Control Act states:
No person shall fire, or in any way discriminate against, or cause to be fired or discriminated against, any employee or any authorized representative of employees by reason of fact that such employee ... has filed, instituted, or caused to be filed or instituted any proceeding under this chapter ... or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter....
33 U.S.C. § 1367; see also 42 U.S.C. § 7622; 42 U.S.C. § 9610; 42 U.S.C. § 300j-9; 42 U.S.C. § 6971; 15 U.S.C. § 2622. Section 24.1 of Title 29 of the Code of Federal Regulations implements the employee protection provisions enacted in these statutes. See 29 C.F.R. § 24.1 et seq.
A plaintiff claiming retaliatory discharge under these whistleblower statutes must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) she suffered an adverse employment action; and (4) a causal connection existed between the pi'otected activity and the adverse action. Hooven-Lewis v. Caldera, 249 F.3d 259, 272 (4th Cir.2001) (retaliatory discharge under Title VII); Simon v. Simmons Foods, Inc., 49 F.3d 386, 389 (8th Cir.1995) (retaliatory discharge under Toxic Substances Control Act, Water Pollution Control Act, Solid Waste Disposal Act, and the Clean Air Act). In showing that the *576 whistleblowing activity was protected, the plaintiff must establish that her allegations were based on a good faith, reasonable belief that the employer engaged in safety violations. See Passaic Valley, 992 F.2d at 478 (“employees must be free from threats to their job security in retaliation for their good faith assertions of corporate violations of the statute.”); Love v. RE/MAX of Am,, Inc., 738 F.2d 383, 385 (10th Cir. 1984) (activity protected even if it is “based on a mistaken good faith belief that Title VII has been violated”); Johnson v. Old Dominion Sec., No. 86-CAA-3, 1991 WL 733576, at *6 (Sec’y May 29, 1991) (activity protected so long as it is “grounded in conditions constituting reasonably perceived violations ... ”). Moreover, whistleblower protection does not turn on whether the plaintiff is “actually successful in proving a violation of a federal safety regulation.” Yellow Freight Sys., Inc. v. Martin, 954 F.2d 353, 357 (6th Cir.1992) (emphasis in original).
C.
The majority largely adopts the reasoning of the ALJ in finding that the February 24, 1999 Letter was not protected activity under the first step of the analysis. Op. at 16. The ALJ concluded that otherwise protected activity becomes unprotected where “the perceived hazard has been investigated by responsible management officials, and if found safe, adequately explained to the employee.” J.A. 34; see Sutherland v. Spray Sys. Envtl., No. 95-CAA-1, electronic slip. op. at 2-3 (Sec’y Feb. 26, 1996); Stockdill v. Catalytic Indus. Maint. Co., Inc., No. 90-ERA-43, 1996 WL 171409, at *1 (Sec’y Jan. 24, 1996). Because school authorities at Southeast and the Health Department had eventually addressed Williams’s complaint, the ALJ determined that her circulation of the February 24,1999 Letter to parents at Southeast claiming that the water fountains contained dangerous levels of lead was unprotected activity. Even under this theory, however, the ALJ’s conclusion erroneously misconstrues and glosses over critical facts contained in the record.
First, the chronology of events indicates that the School System had not fully investigated lead contamination issues in the water fountains until after Williams had circulated the February 24, 1999 Letter. Williams conducted an independent study of the defective water fountain in early January of 1999, sending the samples to an EPA-certified laboratory. There is no dispute that the samples originated from the water fountain located outside the main office at Southeast and that further, the water fountain, for whatever reason, was operating and accessible to students.
The laboratory subsequently released a report dated January 29, 1999, identifying hazardous levels of lead in the samples obtained from the water fountain. While it is true that the Health Department undertook some efforts to test water fountains, the February 11, 1999 Report demonstrates that the Health Department merely cheeked the faucets and water pressure. That report itself states explicitly that the Health Department would return for retesting. Indeed, the Health Department did not take water samples until March 10, 1999. Nor did it release its findings until March 15, 1999 — nearly two weeks after Williams had been suspended.[2] Thus, at the time that Williams circulated the February 24, 1999 Letter, she had no reason to question the results of the laboratory report, which formed a *577 good faith, reasonable basis for her belief that the water fountains at Southeast contained lead contamination.
Second, the March 15, 1999 Report confirmed the results of Williams’s laboratory report insofar as the drinking water in at least one of the water fountains at Southeast contained dangerously high levels of lead on the first flush. While both reports revealed that the drinking water yielded acceptable results after the first flush, the ALJ ignored the system-wide requirement that water fountains which failed the first test but passed after flushing were required to be flushed each morning to clear any lead buildup in the pipes. As such, even water fountains which yielded acceptable results on the second try were not necessarily safe by the School System’s own standards. Significantly, contrary to what the ALJ suggests, the Health Department did not conclude that the water fountain was safe or that the precautionary measure of flushing the water fountain would be sufficient to address the problem. Instead, the Health Department explicitly recommended that the water fountain be turned off even before the water sampling had been conducted — a course of conduct which both Fields and Elam accepted.
To be sure, Fields and Elam shut off all water fountains prior to Williams’s circulation of the February 24, 1999 Letter, thereby foreclosing the possibility of future exposure to lead contamination. Yet, this action did not address any past exposure to lead contamination, which posed a continuous threat to students’ health and welfare. As such, the harms presented by past exposure to lead contamination, which Williams sought to address through student testing, were still extant.
Third, the School System never attempted to engage Williams in any discussion regarding the lead levels contained in the water fountains. Williams approached Fields to discuss the results contained in the laboratory report, but Fields rebuffed those efforts and evinced an utter lack of concern. Furthermore, the record is bereft of any evidence showing that Williams was ever apprised of the February 11, 1999 Report; the March 15, 1999 Report; or the reasons behind Fields’s decision to turn off all the water fountains at Southeast. Despite the objective findings of the March 15, 1999 Report, which virtually concurred with the results of Williams’s laboratory report, the School System never explained to Williams why exposure to lead contamination no longer endangered the students at Southeast. Neither did the School System explain to Williams what steps had been taken to abate the lead contamination problem. It therefore cannot be said that the School System discharged its duty in informing Williams why her continued complaints — at least with respect to past exposure to lead contamination — were unjustified. See Sutherland, No. 95-CAA-l, electronic slip. op. at 3 (finding that once employees complained of unsafe working conditions, employer had a duty to meet with employees and adequately explain why the conditions were safe; “Had Smith adequately explained to the Complainants that the partial containment procedure was safe, the refusal to work would have lost its protection.”).
To the extent that the ALJ purports to discredit Williams based on her perceived fragile mental state, such considerations are irrelevant to the reasonableness standard which applies to determine whether an employee’s conduct is protected. See e.g., Munsey v. Fed. Mine Safety & Health Sewerage Commission, 595 F.2d 735, 742 (D.C.Cir.1978) (rejecting requirement that miners demonstrate their state of mind or the merit of their complaints). Taking the facts as they were known to Williams at *578 the time she circulated the February 24, 1999 Letter, I find that Williams’s reliance on the laboratory report formed a reasonable basis for her belief that the drinking water accessible to students contained lead contamination.
D.
The majority nevertheless concludes that the School System set forth legitimate, non-retaliatory reasons for dismissing Williams based on the ALJ’s determination that she obtained unauthorized access to the list of names and addresses of parents and created disruptions in Southeast’s administrative affairs. Op. at —. Relying on NLRB v. Truck Drivers, Oil Drivers, Filing Station and Platform Workers Union, Local 705, 630 F.2d 505 (7th Cir.1980), the ALJ found that Williams’s unauthorized contact with Southeast parents was “indefensible” in light of the School System’s interest in maintaining an orderly environment for the education of children and an atmosphere of trust with their parents. J.A. 157.
In Truck Drivers, two employees were dismissed as business representatives on behalf of their union because they had discussed their wage complaints over their employer’s radio. Truck Drivers, 630 F.2d at 506. The Seventh Circuit declared that merely characterizing the employees’ conduct as “wage demands” without considering the time, manner and place of such demands was improper. Id. at 508. Specifically, the court stated:
If the “thrust” of the employees’ actions were [sic] here toward obtaining salary increases for themselves and other members of the union staff, their right to petition for wage increases must nonetheless be balanced against the employer’s right to expect a basic loyalty on the part of employees in the performance of their assigned duties.
Id. at 508. Because the employees had blatantly disregarded established procedures for processing wage complaints and engaged in poor work performance, the court found that the dismissals were appropriate and non-retaliatory. Id. at 508-09. Truck Drivers thus stands for the proposition that an employee does not have the absolute right to engage in insubordination even if some of those acts implicate protected activities on his own behalf. Id. at 508; see NLRB v. International Broth, of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers, and Helpers, 581 F.2d 473, 478 (5th Cir.1978) (“To hold that a union has no right to discharge an employee for insubordination ... would, we believe, seriously detract from effective, cohesive union leadership.”)
Truck Drivers is distinguishable from the present appeal for several reasons. Williams attempted to avail herself of the proper channels for reporting environmental violations — first, through MOSH and the Health Department, and second, through Fields. MOSH denied jurisdiction over her complaint and transferred it to the Health Department; the Health Department did not take water samples until more than two months had passed; and Fields directly ignored and rebuffed Williams’s efforts to inform her of the problem. Clearly, the channels for reporting such complaints were not effective, particularly in light of the imminent and continuing danger posed to the students at Southeast.
Moreover, this is not a case in which Williams sought to harass the School System into awarding benefits to herself, as in Truck Drivers. Rather, Williams was determined to make the specific children and parents affected by the cognizable health risks present in the school aware of those *579 immediate dangers. While the ALJ viewed Williams as being an overly zealous crusader who repeatedly annoyed the School System, her efforts time and again forced positive changes and were far from frivolous.
Finally, the employer’s right to be free from disruptions and interferences in the daily administration of its affairs is not absolute; the entire purpose of federal whistleblower statutes is to protect employees who seek to uncover violations that strike at the heart of public safety. Particularly where public safety risks to children are involved, whistleblower activities designed to expose such risks should be unsettling, disruptive, and frightening, so as to inspire positive change.
The mere fact that Southeast became inundated with telephone calls from concerned parents does not mean that the School System’s interest in maintaining an educational environment of order and trust should override the public interest in ensuring the safety of unsuspecting children. Despite receiving objective findings of lead contamination in the drinking water which had been accessible to students at some point, the School System never told students or parents about the risk of exposure to lead contamination or the steps undertaken to abate the exposure to such contamination. Upon receiving Williams’s letter, parents understandably began calling administrative officials at Southeast, distressed mostly because the School System itself had never disclosed the existence of recurring lead contamination issues. Significantly, no parent, student or staff member ever complained about receiving this information. Nor did any of the parents take drastic measures such as keeping their children out of school, calling for the resignation of staff members, or even protesting — a testament, perhaps, to the trust they placed in Southeast’s administration and specifically, Fields.[3]
In my view, the School System’s professed interest in maintaining order and trust appears disingenuous in light of its failure to disclose risks inherent in past exposure to lead contamination and the need for student testing, even if future exposure to lead contamination had been addressed. Moreover, the School System could have avoided the disruption in the administration of its affairs by informing students and parents in the first instance. Instead, the School System retaliated against Williams because she informed parents about the serious risks posed to students from past exposure to lead contamination, thereby embarrassing administrative officials. As such, the School System did not dismiss Williams merely because she used an unauthorized list to contact parents or created disruptions in Southeast’s administrative affairs.
Despite the majority’s best efforts to view the protected nature of Williams’s activities and the legitimacy of the School System’s proffered reasons for her dismissal as distinct issues, the underlying facts indicate that the issues cannot be so easily uncoupled. It is true that Field testified that “even if she believed the Respondent was correct in her allegations regarding lead in the water, she would have still recommended the Respondent’s suspension without pay because of the disruption eause[d] at the school.” Complainant’s CX-139. However, it is also undisputed that her supervisor, Dr. Patricia Abernathy, the Area Executive Officer for *580 the Southeast area, testified that “if she had determined that there was some validity to the Respondent’s allegations, she may have recommended a different disciplinary action.” Id. (emphasis added). Similarly, Sandra Wighton, the Assistant Superintendent for the Southeast area, “confirmed that, even if there were merit to [Williams’s] claims, she still would have recommended some form of discipline, although the form of that discipline may have been different.” J.A. 155 (emphasis added).
As such, two high-ranking officials in the School System admitted that the decision to dismiss Williams was based, in part, on the validity of her allegations, which were ultimately substantiated by the School System’s own report. Moreover, Booker’s recommendation that Williams be dismissed explicitly relied on Dr. Abernathy’s formal recommendation on April 26, 1999, which was more than a month after the release of the March 15, 1999 Report. J.A. 246. Accordingly, I conclude that the School System failed to proffer a legitimate, non-retaliatory reason for dismissing Williams.
I fear that today’s decision unwittingly discourages employees from disclosing information reasonably intended to protect the vulnerable when their employers are unwilling to do so. Because I conclude that Williams engaged in protected activity and that the School System failed to proffer a legitimate, non-retaliatory reason for her dismissal, I respectfully dissent.

. This recitation of the facts is more consistent with the findings of James L. Wiggins, the Hearing Examiner, who found that the Health Department did not sample the water until March 9, 1999 and did not issue a report until March 15, 1999 — two weeks after Williams had been suspended. See Complainant's Ex. CX-139. In his findings of fact and conclusions of law issued pursuant to a full adversarial hearing, the Hearing Examiner determined that Williams's circulation of the February 24, 1999 Letter did not rise to the level of misconduct; that she had the right to file complaints regarding safety and health issues that generally affected the public; and that none of the students, parents or other staff members had complained regarding the February 24, 1999 Letter. Id. Accordingly, the Hearing Examiner ruled in Williams’s favor and recommended that the School System not dismiss her. Id.

. The individualized report on the water fountain in question indicates that the earliest possible date on which the problems could have been reported was March 12, 1999. J.A. 324.

. At least two parents insisted on speaking directly to Fields, and not to an assistant principal or secretary, because they "trusted” her. J.A. 265-66. One of the parents expressed her distress at the fact that the letter had not originated from Southeast itself. J.A. 265.